IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 3:15CR358 |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | |
| | ) | |
| IBRAHIM ZUBAIR MOHAMMAD, | ) | GOVERNMENT'S RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| Defendant-Petitioner. | ) | MOTION FOR RELEASE FROM |
| | ) | CUSTODY |

Now comes the United States of America, by and through its attorneys, Carole S. Rendon, Acting United States Attorney, and Matthew W. Shepherd, Assistant U.S. Attorney, and submits this response in opposition to Defendant Ibrahim Mohammad's Motion for Release from Custody. (Doc. 46). For the following reasons, the government opposes the Defendant's release on bond and requests that his motion be denied.

**I. PROCEDURAL HISTORY**

On September 30, 2015, Ibrahim Zubair Mohammad was charged in a four-count indictment with Conspiracy to Provide Material Support to Terrorists in violation of 18 U.S.C. § 2339A (Count 1); Providing Material Support to Terrorists in violation of 18 U.S.C. § 2339A (Count 2); Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349 (Count 3); and

Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1512(k) (Count 4). (R.1: Indictment). The indictment alleges that Mohammad and his three co-defendants conspired to provide and did provide funds to Anwar Al-Awlaki for use in supporting terrorist attacks; that Mohammad and his brother Yahya Farooq Mohammad conspired to fraudulently obtain funds from financial institutions that had issued credit cards; and that Mohammad and his co-conspirators conspired to obstruct the investigation into the provision of the funds to Awlaki. Mohammad's co-defendants include his brother, Yahya Farooq Mohammad and another pair of brothers, Asif Ahmed Salim and Sultane Roome Salim.

During the time period alleged in the indictment, Mohammad was living in the Toledo, Ohio area. In 2015, prior to being indicted, Mohammad moved to Euless, Texas. Mohammad is not a United States citizen, but is a lawful permanent resident. Mohammad was arrested in Texas on November 5, 2015, and first appeared before a United States Magistrate Judge in the Northern District of Texas that same day. At the initial appearance, Mohammad waived his right to an identity hearing. On November 10, 2015, Mohammad waived his right to a detention hearing in the Northern District of Texas and consented to his transfer in custody to the Northern District of Ohio for further proceedings. (R.8: Rule 5(c)(3) Documents from the Northern District of Texas). Mohammad was subsequently arraigned in the Northern District of Ohio on December 1, 2015. At his arraignment, Mohammad provided a financial affidavit (R.21: Financial Affidavit) and the Court appointed counsel to represent him. The government moved for detention. Mohammad consented to detention at that time, but reserved the right to file a motion requesting release and a hearing at a later date. On February 15, 2016, Mohammad filed the pending Motion for Release from Custody. (R.46: Motion for Release from Custody).

## II. ARGUMENT

Defendant Ibrahim Mohammad's motion for release on bond should be denied because the conditions of release he has proposed do not overcome the presumption of detention contained at 18 U.S.C. § 3142(e)(3)(C), and because he poses a risk of flight and/or danger to the community.

### a.) *Mohammad is subject to a presumption of detention.*

When considering whether a defendant should be released on bond, "[t]he default position of the law … is that a defendant should be released pending trial." United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010). "That default is modified, however, for certain, particularly dangerous defendants." Id. For such defendants, there is a statutory presumption in favor of detention. 18 U.S.C. § 3142(e)(3) provides:

> (3) Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed—
>
> (A) an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21U.S.C. 951 et seq.), or chapter 705 of title 46;
> (B) an offense under section 924(c), 956(a), or 2332b of this title;
> (C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed;
> (D) an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed; or
> (E) an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.

18 U.S.C. § 3142(e)(3).

In this case, Mohammad qualifies as one of those "particularly dangerous defendants" for whom the statutory presumption of detention applies because he was indicted and charged with conspiracy to provide material support to terrorists in Count 1 in violation of 18 U.S.C. §2339A and providing material support to terrorists in Count 2 in violation of 18 U.S.C. § 2339A, both of which are federal crimes of terrorism listed at 18 U.S.C. § 2332b(g)(5)(B) that have maximum punishments greater than 10 years. This places Counts 1 and 2 in the category of offenses covered by the presumption in 18 U.S.C. § 3142(e)(3)(C) described above. An indictment returned by a grand jury is a sufficient finding of probable cause to invoke the presumption. See United States v. Hazime, 762 F.3d 34, 37 (6th Cir. 1985). Thus, the presumption of detention applies to Mohammad.

> b.) *Mohammad's proposed conditions of release do not rebut the presumption of detention.*

Although the presumption of detention applies, Mohammad can rebut the presumption by introducing some evidence that he is not a danger to the community or a flight risk. See Stone, 608 F.3d at 945. Although this is not a heavy burden, in this case, Mohammad has not met that burden with his proposed bond conditions. Mohammad proposes to live with his wife and children in the Toledo area, to seek employment, to post $230,000 cash bond, and to abide by the terms of home confinement on electronic monitoring. Not all proposed living arrangements and bond conditions should be viewed as overcoming the presumption. Merely having a place to live with one's family should not be considered sufficient to overcome the presumption. Most, if not all, defendants can point to a residence to live, promise to seek employment, and to abide by the terms of home confinement. If having a place to live and making promises were enough to overcome the presumption, then the presumption would become meaningless. Mohammad's proposed cash bond of $230,000 might be seen as a significant difference between his case and

4

the average defendant, but the proposed cash bond raises more questions than it answers. Mohammad received court-appointed counsel, yet now promises to provide a $230,000 cash bond.  There is no explanation in his motion for how he went from qualifying for a court-appointed lawyer on December 1, 2015, to being able to put up $230,000 for a cash bond on February 15, 2016.  The Court should find that under these circumstances, Mohammad has not rebutted the presumption of detention.

   *c.)*  *Even if Mohammad has rebutted the presumption of detention, he should still be detained pending trial.*

Should the Court determine that Mohammad's proposed conditions do rebut the presumption of detention, Mohammad's release is not automatic.  The Court must still consider whether detention is appropriate, and the presumption of detention remains a factor in favor of pretrial detention.  As the Sixth Circuit has explained:

> Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighted by the district court.' The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.

Id. (citations omitted).

When considering whether a defendant should be released on bond, the Court should consider several factors, along with the presumption of detention:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse,

5

>criminal history, and record concerning appearance at court proceedings; and
>(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing appeal, or completion of sentence for an offense under Federal, State, or local law; and

>(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(ix) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g). "The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence." United States v. Hinton, 113 F. App'x 76, 77 (6th Cir. 2004); 18 U.S.C. § 3142(f) (stating that the burden of proof for showing danger to the community is by clear and convincing evidence). Consideration of the 3142(g) factors leads to the conclusion that Mohammad should be detained pending trial:

  1.) <u>Nature and circumstances of the offenses charged</u>

 Mohammad is charged with a federal crime of terrorism, one of the classes of offenses specifically listed in the statute as a factor for the Court to consider. This shows the seriousness with which Congress intended courts to take terrorism offenses such as those committed by Mohammad when considering pretrial release. The circumstances of this case show just how serious the charged offenses are. The core of the offenses charged is that Mohammad conspired with his co-defendants to provide Anwar Al-Awlaki with approximately $29,000 for the purposes of committing terrorist acts. This case did not involve a "sting" by government agents in which the funds that were provided never actually reached a terrorist. In this case, the money

6


provided by Mohammad and his co-conspirators went to a real terrorist who shortly thereafter actively engaged in an attempted attack on United States citizens.

The identity of the terrorist in this case and the timing of the provision of the funds illustrate the seriousness of the offense. Anwar Al-Awlaki actively plotted with members of Al-Qaeda in the Arabian Peninsula to commit terrorist acts against the United States. On July 16, 2010, Awlaki was specifically designated as a key leader for al-Qa'ida in the Arabian Peninsula ("AQAP")[1] by the Department of the Treasury pursuant to Executive Order 13224. The press release announcing Awlaki's designation explained Awlaki's (also known as "Aulaqi") role: "Aulaqi has pledged an oath of loyalty to AQAP emir, Nasir al-Wahishi, and plays a major role in setting the strategic direction for AQAP. Aulaqi has also recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's attention on planning attacks on U.S. interests." U.S. Dept. of Treasury, "Treasury Designates Anwar Al-Aulaqi, Key Leader of Al-Qa'ida in the Arabian Peninsula," July 16, 2010. As described in the indictment, Awlaki also published numerous articles on the internet supporting violent jihad, (R.1: Indictment, PageID 4-11), and praised Nidal Hassan for killing 13 United States service members at Fort Hood, Texas on November 5, 2009, calling him a "hero." (Id., at 10-11.) .

The timing of the money provided by the defendants to Awlaki further shows the seriousness of the offense in this case. As described in the indictment, co-defendant Yahya Farooq Mohammad and two other individuals traveled to Yemen at the end of July 2009 to provide approximately $22,000 in funds to Awlaki. This money was provided to an associate of

---

[1] AQAP was designated a Foreign Terrorist Organization by the Department of State on January 19, 2010.

Awlaki on approximately July 26, 2009.  (Id., at 57-58).  On December 25, 2009, Umar Farouk Abdulmutallab attempted to destroy Northwest Airlines Flight 253 over Detroit, Michigan.  According to court documents filed in Abdulmutallab's case, Awlaki and AQAP were behind that bombing attempt and trained Abdulmutallab to carry it out.  The Sixth Circuit summarized the facts of Abdulmutallab's attempted terrorist attack when considering his appeal:

> Umar Farouk Abdulmutallab ("Abdulmutallab"), known nationally as the "underwear bomber," attempted to detonate an explosive device in his underwear on Christmas Day in 2009.  Abdulmutallab's chosen path towards radicalization began in August 2009 when he traveled to Yemen for the purpose of becoming involved in a violent jihadist group associated with Al Qaeda, a designated terrorist organization pursuant to 18 U.S.C. § 2339B(a)(1) and 8 U.S.C. § 1189(a).  During his time in Yemen, Abdulmutallab received training at an Al Qaeda camp under the direction of the radical Imam Anwar Awlaki and agreed to carry out a suicide attack by bombing a United States air carrier over the United States.  The bomb given to Abdulmutallab was built into a pair of underwear and Abdulmutallab was assured that the bomb would defy airport security because it contained no metal parts.

United States v. Abdulmutallab, 739 F.3d 891, 895 (6th Cir. 2014).  Abdulmutallab attempted to detonate the bomb while a passenger on Northwest Airlines Flight 253 with 289 passengers on board.  Fortunately, the bomb did not operate as planned and no lives were lost.  Id.

The importance of the timing of the provision of the funds to Awlaki is that they were provided at the end of July 2009, within weeks of Abdulmutallab's travel to Yemen to meet Awlaki and train in August 2009.  Although there is no direct evidence indicating that the specific funds provided to Awlaki went specifically to Abdulmutallab's bombing attempt, the reasonable inference is that the funds provided to Awlaki at the end of July 2009 went into Awlaki's coffers as part of the pool of funds available to support the training of operational terrorists, including training Abdulmutallab in August 2009 for the attempt to blow up a commercial airliner.

Further, the amount of money was a significant amount of funds for use in terrorist operations for Awlaki at that time when he was in Yemen planning terrorist attacks with AQAP such as Abdulmutallab's attempt. The total amount provided by the defendants was approximately $29,000, spread out over two trips: approximately $7,000 in January 2009 and approximately $22,000 in July 2009. AQAP itself has provided an idea of the significance of that amount of money. In November 2010, AQAP published an issue of its online, English-language magazine, Inspire, devoted to one of its failed terrorist attacks—an attempt to send bombs hidden in printer cartridges to targets in the United States using cargo planes. In that issue, an article explained that the cost of the plot was only $4,200. See Ibrahim, Yahya, "$4,200," Inspire, p. 15, November 2010; Shane, Scott, "Qaeda Branch Aimed for Broad Damage at Low Cost," New York Times, Nov. 20, 2010 (available at http://www.nytimes.com/2010/11/21/world/middleeast/21parcel.html?_r=0). Thus, the total amount involved in the conspiracy would have paid the expenses of approximately *seven* printer bomb plots.

Media reports on the costs of other terrorist attacks also confirm the significance of the funds provided by the conspiracy to a terrorist such as Awlaki. For example, in November 2015, NBC News reported that several notable terrorist attacks cost less than the amount provided to Awlaki by this conspiracy, including the November 2015 Paris attacks that killed 130 people ($10,000 or less); the 1998 bombings of embassies in Kenya and Tanzania that killed over 200 people ($10,000); the 2000 bombing of the USS Cole in Yemen that killed 17 sailors ($5,000 to $10,000); and the 1993 World Trade Center bombing in New York that killed six people ($18,000). See Windrem, Robert, "Terror on a Shoestring: Paris Attacks Likely Cost $10,000 or Less," NBC News, Nov. 18 2015 (available at http://www.nbcnews.com/storyline/paris-terror-

9

attacks/terror-shoestring-paris-attacks-likely-cost-10-000-or-less-n465711). NPR has also reported on the relatively low cost of conducting terrorist attacks, noting in June 2014 that the 2005 bombings in London that killed 57 people cost approximately $14,000. NPR further reported that a suicide vest can cost as low as $1,200 and a suicide car bomb from $13,000 to $20,000. See Temple-Raston, Dina, "How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think," NPR, June 30, 2014 (available at http://www.npr.org/sections/parallels/2014/06/25/325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think). These media reports illustrate the significance of the amount of money provided by the conspirators, as each of the deadly terrorist attacks mentioned above cost less than the $29,000 provided to Awlaki in this case. As set forth, in the hands of a terrorist such as Awlaki, very little money is needed to cause death and destruction.

Mohammad's role in this provision of funds was to serve as the equivalent of a funnel for donations from U.S. based contributors, such as the Salim brothers. These contributors sent their funds to Mohammad and Mohammad then sent the money on to his brother Yahya Farooq Mohammad for delivery to Awlaki. The means for sending the money included an elaborate method of sending the money so that there would not be records of the transfer of funds to his brother. After receiving the donations and depositing the funds into his own account, Mohammad would pay the college tuition and other bills for a relative in the United States. The relative's father overseas would then reimburse Yahya Farooq Mohammad directly for the payments made for his son in the United States. Thus, Yahya Farooq Mohammad received the funds without any records being generated of transfers of funds to him from the United States. Thus, Mohammad and his brother took active steps to avoid detection of the funds transfers,

which shows a consciousness of guilt on their part—that they knew that providing the funds to Awlaki was criminal.

Further, Mohammad and his brother engaged in a conspiracy to defraud financial institutions. Mohammad's brother Yahya Farooq Mohammad obtained credit cards in his name and ran up charges with no intention of paying them back, in a calculated scheme to defraud the issuing financial institutions. Mohammad was a partner in this scheme. The blatant nature of this fraud shows a complete disregard for both the law and the victims of the fraud.

Mohammad also engaged, along with his co-conspirators, in a conspiracy to obstruct justice once the investigation became known. As alleged in the indictment, he initially lied to investigators about financial transactions and deleted relevant emails.

The seriousness of the conduct alleged in this case, with a large potential prison sentence looming, provides every incentive for Mohammad to flee and is an indicator of potential danger to the community. Further, the conduct alleged in this case shows that Mohammad has the ability to raise funds (reinforced by his sudden ability to post a $230,000 cash bond), that he knows how to take steps to conceal the transfer of funds, and that he is willing to obstruct justice.

This factor weighs heavily in favor of detention.

  2.) <u>The weight of the evidence against the person</u>

"This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." <u>Stone</u>, 608 F.3d at 948. Further, "[b]y its terms, it deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community." <u>Hazime</u>, 762 F.2d at 37. These statements from the <u>Stone</u> and <u>Hazime</u> decisions explain that the reference to the weight of the evidence is not an invitation to a mini-trial on guilt or innocence of the specific charges in

advance of the actual trial. Instead, this factor goes to the weight of the evidence relating to the risk of flight or danger to the community posed by release of the defendant.

The grand jury found probable cause to believe that Mohammad conspired to provide funds to Awlaki, that he conspired to commit bank fraud, and that he conspired to obstruct justice. As described above, Mohammad was a facilitator for the collection of funds for Awlaki. For example, as described in the indictment in paragraph 223, the Salim brothers sent their checks totaling over $17,000 to Mohammad for him to deposit into his bank account first, before arranging to transfer the funds to his brother for delivery to Awlaki. (R.1: Indictment, PageID 56). Mohammad's support of Awlaki is also evident. For example, as described in paragraph 263 of the indictment, Mohammad received a link to Awlaki's blog entry, "Nidal Hassan Did the Right Thing," on November 10, 2009. Mohammad's response was "lol [laugh out loud], I was about to send you something along those lines … but decided against it … yeah, I've read it … I read it on aa's [Anwar Al-Awlaki's] website when it was posted this morning .. its been taken down since." (Id., at PageID 63-64). Later, on December 26, 2009, after reports had surfaced that Awlaki had been targeted in an airstrike, Mohammad's responded to an associate, "[M]ay Allah preserve him [Awlaki]." (Id., at PageID 64). These are just a couple examples of Mohammad's support for Awlaki evidenced in the indictment, a support that continued even after Awlaki had publicly stated his support for Nidal Hassan's attack on service members at Fort Hood. This evidence goes to Mohammad's potential danger as it shows his support for a terrorist and the terrorist's goals.

      3.)    <u>The history and characteristics of the person</u>

Mohammad's personal characteristics also support detention. His ties to the local area are debatable. Although he had lived in the Toledo area for a significant period of time prior to

12

2015, he was living in Texas when he was arrested. His family has relocated back to the Toledo area, but he does not currently have employment in this district. He is not a U.S. citizen. He has the ability to raise funds to support flight in a short period of time, as evidenced by his conduct in conspiring to raise money for Awlaki and raising $230,000 to put up as a cash bond from unknown sources. The cash bond itself does not serve to tie Mohammad to the district because, assuming it was provided by others, it is not his money that he would forfeit by fleeing. In his favor, Mohammad has no criminal history, but "courts have never required a prior criminal record before ordering detention." Stone, 608 F.3d at 950. In this case, the other personal characteristics outweigh the lack of criminal history.

        4.)      <u>The nature and seriousness of the danger to any person or the community that would be posed by the person's release.</u>

As explained above, Mohammad is charged with conspiring to provide a significant amount of money to a terrorist, Anwar Al-Awlaki. From Mohammad's financial support of Awlaki one can infer that Mohammad supports the violent jihad against the United States advocated and practiced by Awlaki. Therefore, the nature of the danger posed by release of Mohammad is quite serious.

### III. CONCLUSION

In light of the presumption of detention in this case and the other factors described above, the defendant's request for bond should be denied and he should remain detained pending trial. The conditions proffered by Mohammad are simply not sufficient to ensure the defendant's appearance at trial or the safety of the community under the facts of this case.

Respectfully submitted,

CAROLE S. RENDON
Acting United States Attorney

By: /s/ Matthew W. Shepherd
Matthew W. Shepherd (OH: 0074056)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3859
Matthew.Shepherd@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of February, 2016, a copy of the foregoing Government's Response in Opposition to Defendant's Motion for Release From Custody was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<div style="text-align:right">
/s/ Matthew W. Shepherd<br>
Matthew W. Shepherd<br>
Assistant U.S. Attorney
</div>