UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

     **Plaintiff,**

                                    **Case No. 3:15-cr-358**

     **v.**                                **CHIEF JUDGE EDMUND A. SARGUS, JR.**

YAHYA FAROOQ MOHAMMAD, et al.,

     **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the motions to dismiss filed by Defendants Ibrahim Zubair Mohammad ("Ibrahim"), Asif Ahmed Salim ("Asif"), and Sultane Roome Salim ("Sultane"). For the following reasons, Defendants' motions [ECF Nos. 76, 79, 93] are **DENIED**.

### I.

Ibrahim, Asif, and Sultane were indicted on September 30, 2015, along with their co-Defendant Yahya Farooq Mohammad ("Farooq"), and charged with (Count 1) conspiracy to provide and conceal material support to terrorists, in violation of 18 U.S.C. § 2339A; (Count 2) providing material support to terrorists, in violation of 18 U.S.C. § 2339A; (Count 3) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (brought against Ibrahim and Farooq only); and (Count 4) conspiracy to obstruct justice, in violation of 18 U.S.C. 1512(k). (Indictment at 12–72 [ECF No. 1].)

Ibrahim, Asif, and Sultane have each moved to dismiss Counts 1 and 2 of the Indictment.

Under Count 1, the Government alleges that Defendants conspired to provide and conceal material support and resources, including currency and monetary instruments, tangible property, services, and expert advice and assistance, knowing and intending that the support would be used in preparation for, and in carrying out, violations of 18 U.S.C. §§ 1114 (killing of officers and employees of the United States), 2332 (killing of United States nationals), and 2332b (acts of terrorism transcending national boundaries). (Indictment at 12.) And under Count 2, the Government alleges that Defendants provided material support and resources, including currency and monetary instruments, knowing and intending that the support would be used in preparation for, and in carrying out, violations of 18 U.S.C. §§ 1114, 2332, and 2332b. (*Id.* at 68.)

The Government supports Counts 1 and 2 by quoting various public statements made by Anwar al-Awlaki around the time period in question. (Indictment ¶¶ 11–24.) Those statements include exhortations that al-Awlaki's followers should support "violent jihad" by (i) joining the ranks of the mujahideen (holy warriors), (ii) creating and spreading jihad culture, (iii) preparing for guerilla and urban warfare, (iv) seeking martyrdom during jihad, (v) donating to the mujahideen, (vi) protecting the mujahideen and their secrets, and (vii) following the news of jihad. (*Id.*)

The Government further supports Counts 1 and 2 by describing Defendants' actions and quoting statements from emails sent and received by Defendants. (Indictment ¶¶ 37–277.) In numerous of the quoted emails, Defendants reference al-Awlaki and his writings. (*E.g., id.* ¶¶ 43–44, 47, 63–65, 196, 243, 245, 248–249, 263–265.) In other emails, Defendants discuss their alleged plot to raise money to provide to al-Awlaki in support of violent jihad. (*E.g., id.* ¶¶ 70, 72–73, 77, 91, 102–105, 110, 112, 114–116, 133, 137, 161, 174, 186, 213, 218, 220–224, 228–229, 257–258.)

2

## A.     Alleged Radicalization and the First Trip to Yemen

The Government alleges, for example, that Ibrahim emailed his brother, Farooq, in 2005 about the countries at war with Islam. (Indictment ¶ 39 [ECF No. 1].) Ibrahim observed: "As far as which [country] is more evil, I think what is more important to look at is which country is most actively at war with Islam and that without a doubt is the U.S." (*Id.*)[1]

Beginning in 2007, Farooq and Ibrahim allegedly engaged in a scheme to raise money for jihad through the fraudulent use of Farooq's credit in the United States. (*See, e.g.*, Indictment ¶¶ 48–52, 78–81.)

Also in 2007, Ibrahim purportedly received an email from Farooq with a transcribed version of the al-Awlaki lecture "Constants on the Path of Jihad." (Indictment ¶ 47.) The lecture focused on "violent jihad." (*Id.*) Ibrahim received another email from Farooq with the subject line "Columbus." (*Id.* ¶ 53.) This email contains a link to an online news video entitled "Jihad in Central Ohio." (*Id.*)

On January 29, 2008, Ibrahim allegedly sent Farooq an email with a link to a document entitled "Engineers of Jihad." (Indictment ¶ 55.) Ibrahim commented in the subject line: "Check out the abstract on this. You[']ll [sic] laugh hard." (*Id.*) The abstract stated: "We find that graduates from subjects such as science, engineering, and medicine are strongly overrepresented among Islamist movements in the Muslim world, though not among the extremist Islamic groups which have emerged in Western countries more recently. We also find that engineers alone are strongly overrepresented among graduates in violent groups in both realms." (*Id.*) Farooq later responded: "Looks like they've found us out :)." (*Id.* ¶ 57.)

---

[1] In this paragraph, and in others throughout this Opinion and Order, the Court quotes the Indictment. The Indictment, in turn, contains numerous quotations from Defendants' communications. When quoting the communications contained in the Indictment, the Court omits internal quotation marks.

As an additional note, Defendants' quoted communications from the Indictment are merely allegations at this stage—even if the Court has not specifically labeled them as allegations in the text.

On August 31, 2008, Asif purportedly forwarded an email from Farooq to his brother,

Sultane, and another individual that contained the text from an al-Awlaki blog entry entitled

"Establishing Khilafa." (Indictment ¶ 65.) In that entry, al-Awlaki wrote,

> [t]oday the Muslim world is under occupation and the statements of our scholars
> are clear that it becomes [obligatory] on every able Muslim to fight to free the
> Muslim land. When something is [obligatory] it is [obligatory]. You cannot
> theorize or hypothesize otherwise . . . . So even if you do not believe Jihad to be
> the way to establish khilafah you must agree that Jihad is [obligatory] . . . . What I
> mean by Jihad here is not just picking up a gun and fighting. Jihad is broader than
> that. What is meant by Jihad in this context is a total effort by the ummah to fight
> and defeat its enemy . . . . Fight the disbelievers with your self, your wealth and
> your tongues. It is what Clausewitz would refer to as 'total war' but with the
> Islamic rules of engagement. It is a battle in the battlefield and a battle for the
> hearts and minds of the people.

(*Id.*) That same day, Sultane emailed Asif about a quote from an Islamic society leader in the

United States who praised the service of Muslims in the United States military. (*Id.* ¶ 66.) He

commented: "she has taken what awlaki spoke against and shattered new barriers. It's one thing

to say ballots over bullets to bring about positive change. [I]t's another to say bullets for the

believers." (*Id.*)

On September 15, 2008, Ibrahim purportedly emailed several individuals an al-Awlaki

blog post entitled "Food Reviews from Behind Bars: Everthing [sic] Else." (Indictment ¶ 67.)

Ibrahim commented about the post: "May Allah bless this ummah [worldwide Muslim

community] and elevate those who're truly struggling for it with their wealth and their souls."

(*Id.* ¶ 68.) And Ibrahim later sent an email to an unindicted individual, stating:

> [I]ts [sic] because our societies are corrupt, tyrannical and sinful that our leaders
> are also corrupt, tyrannical sinners . . . the least we can do on our part is to
> implement Islam in our lives and try to spread it to those around us, especially our
> families. Of course there's a lot more we can do, with our lives and our wealth if
> only Allah gives us the tawfeeq [opportunity].

(*Id.* ¶ 100.)

4

In November 2008, unindicted co-conspirators #2 and #3 allegedly exchanged emails regarding a trip to Yemen to meet al-Awlaki. (Indictment ¶¶ 70–74.) As the discussions were ongoing, Farooq sent an email to Ibrahim with the subject line "financial terrorism." (*Id.* ¶ 75.)

In December 2008, unindicted co-conspirator #2 allegedly traveled to Yemen and met with al-Awlaki in person. (*Id.* ¶ 77.)

## B. Alleged Fundraising and the Second Trip to Yemen

Soon after the December 2008 trip, the conspirators allegedly began planning another trip to Yemen for January 2009. (Indictment ¶ 103 [ECF No. 1].) They intended, once again, to meet with al-Awlaki. (*See id.*) As they planned the January trip, unindicted co-conspirator #3 suggested that they meet to discuss "contributions collected so far" and what gift to bring for "Shk [al-Awlaki]." (*Id.*)

Beginning in early 2009, Farooq and Ibrahim purportedly obtained money for jihad by paying for a student's car and college tuition in Ohio in exchange for reimbursement in the United Arab Emirates from the student's father. (*See, e.g.*, Indictment ¶¶ 95–99, 106, 134.)

On January 6, 2009, Ibrahim received an email in which Farooq implored Ibrahim to check out the latest al-Awlaki blog post. (Indictment ¶ 93.) The email contained a link to al-Awlaki's "44 Ways of Supporting Jihad." (*Id.*) The next day, Asif allegedly sent a communication to unindicted co-conspirator #1 in which Asif discussed duty and prayer:

> [W]ell du'a [prayer] is a powerful weapon, we shouldn't underestimate it . . . but, at the same time, it does, in no way, absolve us of our duties . . . check this quote out . . . this was from many years ago . . . scary how its [sic] still pertinent . . . 'Every day Muslim men, women, and children join the ranks of anonymous martyrs. Their stories will never surface in (the) media, but they will be featured in the Annals of Truth that will (be) unfolded on the Day of Judgement [sic]. I mourn the suffering of these brothers and sisters, but I do not fear for their ultimate outcome . . . . Rather, I fear for the Muslims who stand aside as the war against Islam rages on. May Allah give us the clarity in knowledge and courage in deeds to defend our fellow Muslims.' . . . the bad thing about that du'a [prayer] is

that He pretty much already has done that . . . now the ball's in our court . . . and therein lies the rub.

(*Id.* ¶ 101.)

In a January 19, 2009 communication between Farooq and unindicted co-conspirator #1, Farooq allegedly stated that the "brothers" were planning to go to Yemen. (Indictment ¶ 110.) He then described the fundraising efforts leading up to the trip: "I got about $6K so far . . . I'm meeting the other two brothers tonight . . . I'll find out how much they collected as well . . . and if you have any questions, I can pass them to the Sh [Awlaki]." (*Id.*) Referring to the Yemen trip in a separate email, unindicted co-conspirator #3 also described the fundraising efforts: "Our collections so far have reached around USD 7000 [$7,000] . . . with most of it coming from the US :)!!" (*Id.* ¶ 112.)

On January 20, 2009, Farooq allegedly informed Ibrahim that he had a ticket for Sanaa, Yemen. (Indictment ¶ 115.) In that email, with the subject line "trip," Farooq instructed Ibrahim: "keep it to yourself for now" and "if you can raise more funds, that would be good." (*Id.*) Farooq then asked if Ibrahim could suggest a gift. (*Id.*)

Unindicted co-conspirators #2 and #3 allegedly travelled to Yemen to meet with al-Awlaki on January 28, 2009. (Indictment ¶ 133.) They provided him approximately $7,000. (*See id.*) Farooq had allegedly raised around $6,000 of that sum. (*Id.*) Farooq was unable to travel, though, because he was ill. (*Id.*)

## C.    Allegations of Additional Fundraising and the Third Trip to Yemen

After the trip, unindicted co-conspirator #3 allegedly sent Farooq and unindicted co-conspirator #2 an email about actions that they could take to continue supporting al-Awlaki. (Indictment ¶ 136 [ECF No. 1].)

6

On February 27, 2009, Ibrahim allegedly emailed Farooq a video depicting a Taliban ambush of a military convoy in Afghanistan. (Indictment ¶ 150.) The video, entitled "Taliban Mujahideen: Fighting in Helmand and the Aftermath," includes a banner reading, in both Arabic and English, "Heavy Battle with Crusaders and Their Servants many Killed and other injured (Helmand)." (*Id.*)

In a March 1, 2009 email conversation, Farooq updated Ibrahim on his fundraising efforts, stating: "sent 2K. send the wire whenever you get a chance . . . btw, some other bros are collecting funds as well. I need to figure out more ways for transferring. Do you know of any honda there, like we used for sending to india?" (Indictment ¶ 161.) That same month, Farooq sent a message to Ibrahim with the subject line "Fwd: Fly from AED 77 with Air Arabia!" (*Id.* ¶ 176.)

In April 2009, Ibrahim allegedly received two emails from Farooq. (Indictment ¶¶ 189–190.) The first contained a link to the transcript of an interview with a Taliban commander. (*Id.* ¶ 189.) The interview was produced by the media wing of Al-Qaeda. (*Id.*) The second email had the subject "Fwd: Prepared to die for Islam" and included a link to an article about individuals from the United States and United Kingdom fighting on behalf of Al-Shabaab. (*Id.* ¶ 190.)

On June 29, 2009, Asif purportedly sent an email to Sultane and three other individuals, stating: "I came across some stuff in reference to our conversations (in Columbus) about giving tidings of Hellfire to the dead kuffar [non-believers] in their graveyards. It is attached." (Indictment ¶ 212.)

Farooq and unindicted co-conspirators #2 and #3 allegedly exchanged a series of emails on June 30 and July 1, 2009 regarding an upcoming trip to Yemen to see al-Awlaki. (Indictment ¶ 213.) The conspirators discussed the dates and other logistics of their trip. (*Id.*)

In a July 7, 2009 email to Farooq with the subject line "Trip," Asif allegedly stated: "I tried to wire some today and, apparently, the routing number is wrong. The lady said there's a difference between a regular routing number and a wire (transfer) routing number. Do you know anything about that?" (Indictment ¶ 218.) In response, Farooq explained to Asif that "it would be easier if you just mail a check to my brother[,] [Ibrahim], and he can deposit it in my account. Just let me know the total amount, and I'll cover it from here." (*Id.* ¶ 220.) Farooq further explained: "A friend is arranging visas this week, we plan to go on the 23rd." (*Id.*) Asif forwarded Farooq's response to Sultane, stating "[h]ere's the info. Git 'er done." (*Id.* ¶ 221.)

On July 13, 2009, Ibrahim allegedly deposited $17,060 into Farooq's checking account. (*Id.* ¶ 223.) This deposit included a check from Asif for $2,000 and checks from Sultane for $2,400, $6,200, and $6,400. (*Id.*)

Following the deposits, Farooq allegedly emailed unindicted co-conspirators #2 and #3, stating: "I now have 20K collected . . . a large part of that is in my US account. I can't think of a way of getting it here in time. Let's meet tomorrow to discuss." (*Id.* ¶ 224.)

Farooq emailed Ibrahim and Asif on July 22, 2009 with the subject line "trip." (Indictment ¶ 228.) He explained that he was "going to Sanaa tomorrow morning . . . with a couple of friends. We've got visas and other bookings done today. If you want me to pass along any messages or questions, let me know by tonight. . . . Please keep this to yourselves, and make dua [prayer] for our safe trip." (*Id.*)

Ibrahim purportedly asked Farooq in a July 26, 2009 email, "so . . . ?" "how was it?" (Indictment ¶ 230.) Farooq replied: "couldn't meet him, but delivered the goods to a relative." (*Id.* ¶ 231.) On September 4, 2009, Ibrahim informed Farooq that he had a check for $2,414 from

an unindicted individual. (*Id.* ¶ 250.) Ibrahim explained: "[S]ince I'd deposited that $17k, you'd told me not to deposit anymore [sic] so it's still with me." (*Id.*)

On August 22, 2009, Sultane allegedly sent an email with the subject "dnloads" to an unindicted individual. (Indictment ¶ 242.) The email contained a link to a website offering downloads of al-Awlaki's lectures. (*Id.*) The next day, Sultane allegedly emailed Asif with the subject "barb a rossa." (*Id.* ¶ 243.) Sultane stated: "I found the story (as my boy narrated it) in text format right after I talked to you. This should provide all the fodder . . . errrr cannonballs . . . you need. An amazing story." (*Id.*) Beneath that introduction, Sultane included text from the al-Awlaki lecture "Allah is Preparing Us for Victory," regarding the death of Frederick Barbarossa during the crusades. (*Id.*)

On August 30, 2009, Ibrahim purportedly viewed the online news article "Al Qaeda claims Saudi prince bomb." (Indictment ¶ 244.) Several days later, Ibrahim allegedly sent an email to Farooq with the subject line "A A lecture." (*Id.* ¶ 245.) The email contained a link to al-Awlaki's lecture "Beyond Guantanamo: Is This The End?" (*Id.*) Soon after, Ibrahim purportedly viewed another online news article: "IEDs wreak havoc among forces in Afghanistan." (*Id.* ¶ 252.) He allegedly searched YouTube for "Taliban ied" videos. (*Id.*) And he allegedly visited a website offering the complete collection of al-Awlaki lectures updated through September 2009. (*Id.* ¶ 254.)

On September 3, 2009, Sultane purportedly received a link to al-Awlaki's lecture "Beyond Guantanamo: Is This The End?" (Indictment ¶ 248.) Sultane replied with a link to al-Awlaki's website. (*Id.* ¶ 249.)

On September 26, 2009, Asif purportedly checked in with Farooq about his trip. He emailed Farooq asking: "Anything on the southern front?" (Indictment ¶ 257.) Farooq

replied: "There's no communication on the southern front since before Ramadaan. Things seem to have become very chaotic up north just after our visit though. I'll keep you updated if I hear anything." (*Id.*) Farooq later followed up with an email sent to Asif, Ibrahim and several other individuals. (*Id.* ¶ 258.) The subject line was "AA email." (*Id.*) Farooq stated: "[Thank you] to everyone who helped. Please let me know if you can find any useful info." (*Id.*) Farooq then provided a link to an image file that had been uploaded to a private portion of a website. (*Id.*) The email included the username and password needed to access the file. (*Id.*)

On November 10, 2009, after the Fort Hood shooting, Ibrahim received from an unindicted individual a news story about the al-Awlaki blog entry "Nidal Hassan Did the Right Thing." (Indictment ¶ 263.) Ibrahim purportedly responded: "lol, I was about to send you something along those lines . . . but decided against it . . . yeah, I've read it . . . I read it on aa's website when it was posted this morning . . . its [sic] been taken down since." (*Id.*)

Around a month later, Ibrahim received a link to an online news story about an attempted airstrike on Al-Qaeda leaders in Yemen, including al-Awlaki. (Indictment ¶ 264.) Ibrahim allegedly responded to that story: "[M]ay Allah preserve him [Awlaki]." (*Id.*)

In an April 21, 2010 email exchange, Sultane purportedly messaged an unindicted individual about "da trip." (Indictment ¶ 268.) Sultane referenced an upcoming hiking trip, stating "I'm glad you're thinking about it more seriously now [because] I definitely don't want you thinking it'll be a walk in the park." (*Id.*) Sultane reminded the individual of "ahadeeth" that stated: "If someone dies without participating in <blank> and not having the intention of ever doing <blank>, he has died on a branch of [h]ypocrisy." (*Id.*) Sultane added: "(For me, I don't think playing tennis on the weekends or listening to CD's proves that I had the intention.)." (*Id.*)

**D.    Alleged Conversations with the FBI**

After al-Awlaki's death in the fall of 2011, the FBI spoke with Sultane, Ibrahim, and Asif.

Sultane spoke with FBI agents on October 19, 2011. (Indictment ¶ 271 [ECF No. 1].) He told them that he had written checks to Ibrahim to repay a loan that Ibrahim had made to him in 2002. (*Id.*) He allegedly claimed that he had no knowledge of Farooq. (*Id.*) He allegedly indicated that he had never watched an al-Awlaki lecture or video. (*Id.*) And he purportedly denied having any knowledge of al-Awlaki's website. (*Id.*)

Sometime between October 19, 2011 and January 9, 2012, Farooq allegedly instructed Ibrahim to lie to the FBI if questioned. (Indictment ¶ 272.) Ibrahim eventually spoke with FBI agents on December 8, 2011; he allegedly claimed that he had not engaged in any financial transactions with Sultane or Asif. (Indictment ¶ 273.) He allegedly claimed that Sultane and Asif had not written any checks to him. (*Id.*) And he purportedly stated that he would have no reason to engage in such transactions and that he would remember them if they occurred. (*Id.*)

And lastly, Asif spoke with FBI agents on January 9, 2012. (Indictment ¶ 275.) He allegedly stated that he had never provided funds to Farooq and that Sultane had never told him the purpose of any funds provided to Farooq. (*Id.*) Sometime between November 22, 2011, and his meeting with the FBI, Asif allegedly deleted all of the emails located in a folder entitled "Trips." (*Id.* ¶ 277.) The deleted emails purportedly included correspondence with Farooq and conversations related to hiking trips made in 2009 and 2010. (*Id.*)

**II.**

Under Federal Rule of Criminal Procedure 12(b)(3)(B), a court may hear, by pretrial

motion, defenses that can be determined without a trial on the merits, including the claim that the indictment in a case fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B). A motion to dismiss can be determined without a trial on the merits "if it involves questions of law instead of questions of fact on the merits of criminal liability." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997).

"An indictment must include 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Schaffer*, 586 F.3d 414, 422 (6th Cir. 2009) (quoting Fed. R. Crim. P. 7(c)(1)). An indictment is constitutionally adequate if it (1) contains the elements of the offense charged, (2) fairly informs a defendant of the charge against which he must defend, and (3) is sufficiently specific to allow the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts. *Schaffer*, 586 F.3d at 422; *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001); *United States v. Abdi*, 498 F. Supp. 2d 1048, 1055 (S.D. Ohio 2007). An indictment is typically sufficient "'if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense.'" *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007) (quoting *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992)); *see also Abdi*, 498 F. Supp. 2d at 1055 (An indictment is generally sufficient "when it tracks the language of the statute."). The recitation of statutory language, however, "'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged.'" *Id.* (quoting *Superior Growers Supply*, 982 F.2d at 176) (internal quotation marks omitted).

An indictment "must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *McAuliffe*, 490 F.3d at 531. An indictment, moreover, "is to be construed liberally in favor of its sufficiency." *Id.*

## A. Asif

### 1. Proof of Intent

The Court begins with Asif's Motion to Dismiss. Asif insists that Counts 1 and 2 of the Indictment fail to state an offense because they charge him with violating § 2339A "without proving a specific intent to materially support one of the enumerated crimes in § 2339A(a)." (Asif Mot. to Dismiss at 6 [ECF No. 79].)

Asif's argument starts on poor footing. He implies, incorrectly, that the Government must *prove* elements of an offense in the Indictment. (*See id.*) The Government has no such burden. An indictment is "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Only at trial must the Government prove—beyond a reasonable doubt—the elements of the charged offenses.

Viewed under the correct standard, Counts 1 and 2 of the Indictment adequately allege Asif's purported violations of 18 U.S.C. § 2339A. Under that statute,

> [w]hoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [an enumerated federal law, including 18 U.S.C. §§ 1114, 2332, and 2332b] or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be [punished].

18 U.S.C. § 2339A(a). Section 2339A, in turn, defines "material support or resources" to mean

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert

13

advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Id.* § 2339A(b)(1).

In Count 1, the Government offers a plain, concise, and definite written statement of the essential facts constituting Defendants' alleged conspiracy to provide and conceal material support and resources to terrorists:

> From an exact date unknown, but at least as early as on or about January 1, 2005, and continuing until in or around January 2012, in the Northern District of Ohio, and elsewhere, the defendants YAHYA FAROOQ MOHAMMAD, IBRAHIM ZUBAIR MOHAMMAD, ASIF AHMED SALIM, and SULTANE ROOME SALIM did knowingly and intentionally combine, conspire and agree with and among each other, and with and among others known and unknown to the Grand Jury, to provide material support and resources, and to conceal and disguise the nature, location, source, and ownership of material support and resources, to wit: property and services, including currency and monetary instruments, tangible property, services, and expert advice and assistance, knowing and intending that they were to be used in preparation for, and in carrying out, violations of Title 18, United States Code, Sections 1114 (killing of officers and employees of the United States), 2332 (killing of U.S. nationals), and 2332b (acts of terrorism transcending national boundaries).

(Indictment ¶ 26 [ECF No 1].) And in Count 2, the Government again offers a plain, concise, and definite written statement of the facts constituting Defendants' alleged provision of material support and resources to terrorists:

> In or about July 2009, in the Northern District of Ohio, and elsewhere, the defendants YAHYA FAROOQ MOHAMMAD, IBRAHIM ZUBAIR MOHAMMAD, ASIF AHMED SALIM, and SULTANE ROOME SALIM did knowingly and intentionally provide material support and resources, to wit: property and services, including currency and monetary instruments, knowing and intending that they were to be used in preparation for, and in carrying out, violations of Title 18, United States Code, Sections 1114 (killing of officers and employees of the United States), 2332 (killing of U.S. nationals), and 2332b (acts of terrorism transcending national boundaries).

(*Id.* ¶ 279.)

The Government's allegations address Defendants' intent—along with each of the other elements of the crimes set forth in 18 U.S.C. § 2339A. *See Landham*, 251 F.3d at 1079; *Abdi*, 498 F. Supp. 2d at 1055. The Government's allegations, moreover, are sufficiently specific to both fairly inform Defendants of the charges against which they must defend and to enable Defendants to plead double jeopardy in a subsequent proceeding, if they were to face charges based on the same set of facts. *See Schaffer*, 586 F.3d at 422; *Landham*, 251 F.3d at 1079.

In addition to the allegations quoted above, the Government added considerable factual details to the Indictment to further inform Defendants of the charges that they face. Those additional details, as noted earlier, include descriptions of al-Awlaki's writings and public pronouncements and quotations from Defendants' email communications. (*See* Indictment ¶¶ 11–24, 37–277 [ECF No. 1].)

### 2. Email Communications

Asif contends that the Government may not rely on his email communications to evidence his intent under § 2339A. (Asif Mot. to Dismiss at 8 [ECF No. 79].) Those communications are, he argues, First Amendment protected speech that cannot be used to establish "specific intent to a certain crime" under the Sixth Circuit's holding in *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012). (*Id.* (emphasis deleted).) Speech can only be used "to establish evidence of a conspiracy," Asif avers. (*Id.*)

Asif misapprehends the holding in *Amawi*. In *Amawi*, the Sixth Circuit indicated that "juries can consider speech as evidence in a conspiracy." *Amawi*, 695 F.3d at 482. The Sixth Circuit never suggested, however, that speech can be used *only* to establish evidence of a conspiracy. The court, in fact, offered no qualifications on the evidentiary use of speech in criminal prosecutions: "'The First Amendment . . . does not prohibit the evidentiary use of

speech to establish the elements of a crime or to prove motive or intent.'" *Id.* (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)). The Government cannot obtain a conviction by simply proving that a defendant talked with others about political or religious ideas. *Id.* The Government can rely on those conversations, though, as evidence of a defendant's criminal behavior. *See id.*

Here, the Government permissibly highlights Asif's communications as evidence (i) of his alleged conspiracy to provide and conceal material support and resources to al-Awlaki and (ii) of his alleged provision, and concealment, of that material support to al-Awlaki (i.e., Counts 1 and 2 of the Indictment). The communications suggest that Asif acted with the requisite intent. That is, they suggest that Asif knew or intended that his alleged material support would be used in preparation for, and in carrying out, violations of 18 U.S.C. §§ 1114, 2332, and 2332b. (*See* Indictment ¶¶ 37–277 [ECF No. 1].)

To the extent that Asif challenges the sufficiency of the Government's evidence, (*see* Asif Mot. to Dismiss at 8–11), such a challenge is not appropriately made in a motion to dismiss. Aside from misconstruing the Government's obligations in drafting an indictment (as discussed earlier), *see* Fed. R. Crim. P. 7(c)(1), Asif's contention that the Government has failed to prove that he gave money with the necessary criminal intent is a factual issue that must be resolved through a trial on the merits—not through a motion to dismiss under Criminal Rule 12(b)(3)(B). *See Craft*, 105 F.3d at 1126.

### 3. Differing Intent Requirements in §§ 2339A and 2339B

Asif is not accused of violating 18 U.S.C. § 2339B. He cites it, however, to contrast its intent requirement with the intent requirement found in § 2339A.

Section 2339B punishes "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so." 18 U.S.C. § 2339B(a)(1). To

violate § 2339B, "a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism." *Id.*

Asif encourages the Court to review the legislative history leading to the passage of §§ 2339A and 2339B. This review would purportedly reveal that "Congress passed § 2339B to deal with a problem that § 2339A cannot[:] . . . the fungibility of money." (Asif Mot. to Dismiss at 11 [ECF No. 79].) The review, consequently, would demonstrate that "§ 2339A is simply not the correct section to deal with material support that involves cash and money [as involved here], because the fungib[le] nature of cash basically prevents the government from proving the exacting intent that the defendant intended to use his/her money to fund a specific terrorist plot." (*Id.* at 12.)

The Court need not dive into that rabbit hole. "'In all cases of statutory construction, the starting point is the language employed by Congress.'" *Vergos v. Gregg's Enters., Inc.*, 159 F.3d 989, 990 (6th Cir. 1998) (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)). "Where 'the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)) (internal quotation marks omitted). Here, the plain language of § 2339A reveals (i) that the statute applies to material support involving cash or money and (ii) that a prosecution under the statute need not involve a specifically identified terrorist plot. Section 2339A(a) punishes individuals who provide "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation" of an enumerated federal law. 18 U.S.C. § 2339A(a). Section 2339A(a) makes no mention of specific terrorist plots or earmarked funds. Section 2339A does, however, explicitly reference money: in its definition of "material

17

support or resources," § 2339A(b)(1) specifically includes "*currency or monetary instruments.*" 18 U.S.C. § 2339A(b)(1) (emphasis added). The Government, in short, can bring a material support prosecution under § 2339A involving cash or money, and the Government need not identify the specific plot that the cash or money is intended to support. *See* 18 U.S.C. § 2339A; *see also United States v. Jayyousi*, 657 F.3d 1085, 1105 (11th Cir. 2011) (determining that the government, in a § 2339A prosecution, had to prove the defendants "knew that they were supporting mujahideen who engaged in murder, maiming, or kidnapping in order to establish Islamic states").

### 4. As-Applied Constitutional Vagueness Challenge

For his last argument, Asif contends that his prosecution under § 2339A violates the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). (Asif Mot. to Dismiss at 13 [ECF No. 79].) Asif cites *Humanitarian Law Project* for the proposition that § 2339A is constitutional only because of its mens rea requirement—the requirement that a defendant must provide material support *knowing or intending* that it be used in preparation for, or in carrying out, a violation of one of the statute's enumerated criminal offenses. (*See id.*) Asif asserts, in other words, that without this specific intent requirement, § 2339A is unconstitutionally vague. (*See id.* at 13–14.)

Although Asif acknowledges that § 2339A is constitutional as written (because of its specific intent requirement), he purports to challenge its constitutionality as applied here. (*See* Asif Mot. to Dismiss at 14.) Asif argues that the Government will not be able to establish his specific intent, and that, consequently, his prosecution under § 2339A will not pass constitutional muster. (*See id.* ("Charging Mr. Salim under § 2339A while not being able to establish specific intent will compromise § 2339A's constitutionality.").) Asif's argument is not suitable for

18

resolution on a motion to dismiss. *See* Fed. R. Crim. P. 12(b)(3)(B). Determining whether the Government can prove beyond a reasonable doubt that Asif acted with the required intent under § 2339A involves questions of fact and will, thus, require a trial on the merits. *See Craft*, 105 F.3d at 1126. Asif's Motion to Dismiss is denied.

## B.    Ibrahim

### 1.    Adopted Arguments

The Court now turns to Ibrahim. As an initial matter, Ibrahim has joined Asif's Motion to Dismiss and adopted the arguments presented in that Motion. (Ibrahim Mot. to Join at 2 [ECF No. 142].) As explained above, however, those arguments lack merit. And the Court moves on to the arguments that Ibrahim advances in his own Motion to Dismiss.

### 2.    Allegations of Intent to Commit the Predicate Crimes

Ibrahim contends that the Government, in bringing a prosecution under 18 U.S.C. § 2339A, must "plead facts demonstrating the specific intent to commit the alleged predicate crime[s]"—18 U.S.C. §§ 1114 (killing of officers and employees of the United States), 2332 (killing of U.S. nationals), and 2332b (acts of terrorism transcending national boundaries). (Ibrahim Mot. to Dismiss at 3 [ECF No. 76].) Those facts are purportedly absent from the Indictment. (*Id.*) The allegations in the Indictment, he argues, "do not reveal an identifiable instance of a specific act that constitutes an offense of any of the predicate statutes. There is no pleading facts that identify an act of terror in planning stages." (*Id.* at 4 ("The Government's reliance and repetition of the phrase 'violent Jihad' illustrates the absence of allegations of specific intent in the [I]ndictment.").)

Ibrahim misreads § 2339A. Section 2339A does not punish individuals for violating the federal laws enumerated in the statute. *See* 18 U.S.C. § 2339A(a); *see also United States v.*

*Hassoun*, 476 F.3d 1181, 1188 (11th Cir. 2007) ("[T]he Government need not prove all the elements of § 956, the object offense, in order to satisfy the elements of the substantive § 2339A charge."). Nor does it punish based on whether the recipient of the material support attempted to violate, or succeeded in violating, one of the enumerated federal laws. *See* 18 U.S.C. § 2339A(a); *see also Hassoun*, 476 F.3d at 1188 ("By its elements, § 2339A criminalizes material support given 'in preparation for' the object offense—clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense."). Section 2339A punishes individuals who *provide*, or *conspire to provide*, "material support or resources . . . *knowing or intending* that they are to be used *in preparation for, or in carrying out, a violation*" of an enumerated federal law. 18 U.S.C. § 2339A(a) (emphasis added).

The statute, in other words, punishes the action of providing or conspiring to provide material support or resources. 18 U.S.C. § 2339A(a). It punishes that action when the individual knows or intends that the material support or resources are to be used in preparation for, or in carrying out, a violation of an enumerated federal law. *Id.* And with respect to the known or intended violation of federal law, the statute refers generically to "a violation," not "a specific violation" or "a violation identified in advance," as Ibrahim seems to imply. *Id.*

Here, the Government has properly alleged a violation of § 2339A. Paragraphs 26 and 279 of the Indictment, quoted earlier, allege that Ibrahim and the other Defendants conspired to, and did, provide material support knowing and intending that the support be used in preparation for, and in carrying out, violations of 18 U.S.C. §§ 1114, 2332, and 2332b. (Indictment ¶¶ 26, 279 [ECF No 1].) The Government then supplemented those allegations with quotes from Defendants' communications and descriptions of Defendants' activities. The Court denies Ibrahim's Motion to Dismiss.

20

## C.    Sultane

### 1.    Allegations of Intent

The Court now considers Sultane's Motion. Sultane insists that the Government has insufficiently alleged his intent under 18 U.S.C. § 2339A. (Sultane Mot. to Dismiss at 5–6 [ECF No. 93].) The Indictment, Sultane argues, contains insufficient allegations of (i) his purported knowledge or intent that his payment to Farooq would be used in preparation for, or in carrying out, a violation of one of the enumerated federal laws and (ii) his purported entrance into a conspiracy with the other Defendants. (*See id.*)

The Government has sufficiently alleged that Sultane violated § 2339A. As discussed above, Paragraphs 26 and 279 of the Indictment allege that Sultane and the other Defendants conspired to, and did, provide material support knowing and intending that the support be used in preparation for, and in carrying out, violations of 18 U.S.C. §§ 1114, 2332, and 2332b. (*See* Indictment ¶¶ 26, 279 [ECF No 1].) And as also discussed above, the Government supports those allegations with quotes from Defendants' communications and descriptions of Defendants' activities. (*See id.* ¶¶ 37–277.)

Sultane posits that the Indictment's allegations are inadequate because they do not contain an "email or communication directly to [him] indicating that he knew of any of the codefendants' intentions to go to Yemen." (Sultane Mot. to Dismiss at 6 [ECF No. 93].) The allegations, he notes, fail to "specifically allege[] that [he] knew his money . . . would be used in support of a conspiracy to aid Anwar [al-]Awlaki." (*Id.* at 5.) And the allegations fail to identify a statement in which Sultane explicitly expresses the desire to support al-Awlaki. (*See id.* at 6.)

The fact that the Government did not cite a "smoking gun" email in its Indictment does not prevent the Government from prosecuting Sultane for providing material support. The

Government, as explained earlier, need not prove its case in the Indictment. It must provide, as it has here, "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). And, despite Sultane' assertions, when the Government does attempt to prove its case at trial, it need not rely only on evidence that directly demonstrates guilt beyond a reasonable doubt. "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.' The jury may draw any reasonable inference from direct, as well as circumstantial, proof." *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000) (citation omitted) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

Nor does the lack of a "smoking gun" email prevent the Government from prosecuting Sultane for conspiring to provide material support. As the Sixth Circuit has explained, "[a]n agreement need not be express to form a conspiracy . . . . No formal agreement is required." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999). A conspiracy requires: "'(1) An object to be accomplished[;] (2) A plan or scheme embodying means to accomplish that object[;] [and] (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.'" *Id.* (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)). Pertinent here: a conspiracy "may be inferred from relevant and competent circumstantial evidence, such as the acts of the conspirators themselves." *United States v. Milligan*, 17 F.3d 177, 182–83 (6th Cir. 1994). And "[o]nce the existence of a conspiracy is established, slight evidence is sufficient to implicate a defendant. A defendant may be guilty of conspiracy despite possessing limited knowledge of the conspiracy's scope, details and membership." *Id.* at 183 (citation omitted).

The Government's allegations, although circumstantial at times in their support of the charges against Sultane, contain the elements of the charged offenses, inform Sultane of the charges against which he must defend, and are sufficiently specific to allow Sultane to plead double jeopardy in a subsequent proceeding. *See Schaffer*, 586 F.3d at 422; *see also McAuliffe*, 490 F.3d at 531 (stating that the allegations in an indictment must be construed "in a practical sense with all the necessary implications").

### 2. Sufficiency of the Evidence

Finally, Sultane argues that his actions do not indicate that he had the intent or knowledge that the monies he repaid Farooq would reach al-Awlaki. (Sultane Mot. to Dismiss at 5–6 [ECF No. 93].) Through this argument, Sultane, like Asif, challenges the sufficiency of the Government's evidence. (*See id.*) But, again, the argument is misplaced. Sultane's argument that the Government has failed to establish that he gave material support with the requisite criminal intent incorrectly assumes that the Government must prove its case in the Indictment rather than at trial. *See* Fed. R. Crim. P. 7(c)(1). The argument is not an issue for the Court to resolve through a motion to dismiss; it is an issue of fact for the jury to decide after a trial on the merits. *See* Fed. R. Crim. P. 12(b)(3)(B); *Craft*, 105 F.3d at 1126. Sultane's Motion to Dismiss is not well taken.

### III.

For the reasons stated above, Defendants' motions to dismiss [ECF Nos. 76, 79, 93] are **DENIED**.

**IT IS SO ORDERED.**

_5-11-2017_
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**